# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Edgar Rafael Barraza-Maldonado,

        Defendant.

**Criminal No. 12-54 (PJS/SER)**

**REPORT AND**
**RECOMMENDATION**

      Jeffrey S. Paulsen and Leeann Bell, Esqs., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

      Daniel L. Gerdts, Esq. 708 North Tyrol Trail, Golden Valley, Minnesota 55416, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

      The above-captioned case came before the undersigned on April 10, 2012 and May 9, 2012, on Defendant Edgar Rafael Barraza-Maldonado's Motion for the Production of Informants for the Purpose of Conducting Pretrial Interviews [Doc. No. 16]; Motion to Suppress Evidence Obtained from Unlawful Searches and Seizures [Doc. No. 18]; and Amended Motion to Suppress Statements Made by Defendant [Doc. No. 22].[1]  This matter was referred to the undersigned for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1.  For the reasons set forth below, the Court recommends Defendant's motions be denied.

---

[1]    The non-dispositive pretrial motions [Doc. Nos. 15 and 17] are addressed in a separate Order.

1

## I. BACKGROUND

The Indictment charges Defendant Edgar Rafael Barraza-Maldonado ("Barraza") with Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A). A pre-trial motions hearing was held on April 10, 2012. Minnesota State Trooper Scott Schnider ("Trooper Schnider") and Drug Enforcement Administration ("DEA") Detective Dennis Otterniss ("Detective Otterniss") testified on behalf of the Government. Two exhibits were received into evidence: U.S. v. Barraza-Maldonado Trooper Video of Traffic Stop (Def.'s Ex. 1) and Minnesota State Patrol Consent to Search Form (Def.'s Ex. 2). Because the Court believed that crucial facts about Barraza's standing were absent from the record, a second pretrial motions hearing was held on May 9, 2012. At that hearing, DEA Agents Kevin Merkling ("Agent Merkling") and Brian Heisag ("Agent Heisag") testified on behalf of the Government. This case is set for trial before Judge Patrick J. Schiltz on June 5, 2012 at 9:00 a.m. in Courtroom 14E in Minneapolis, Minnesota.

## II. FACTS

Though Barraza was driving a car containing a GPS tracking device at the time he was stopped, he lacks standing to challenge the GPS installation and monitoring. Two violations of state law, independent observations of Trooper Schnider, voluntary signing of a consent to search form, and a drug detection dog alert provided ample probable cause for the search that yielded sixteen kilograms of cocaine. Barraza's motions to disclose informants and suppress statements rest solely on a fruit of the poisonous tree analysis. Because no basis for suppression exists, Barraza's motions should be denied.

### A. GPS Tracking Device

DEA agents in Arizona received a tip from a reliable informant that a 2006 maroon Nissan Maxima with a license tag of 801 HWU ("Maxima") would be travelling from Arizona to Minnesota containing illegal drugs in an after-market trap compartment. The tip provided the Maxima's location but did not specify who would be driving the vehicle.

Agent Heisag[2] relied on his training based on then-binding Ninth Circuit precedent that attaching a GPS device to a car and monitoring its location was not a search under the Fourth Amendment and did not require a warrant. Based on the tip he received, Agent Heisag believed that he had probable cause to attach the device and monitor the Maxima. His understanding, at the time, was that he "did not need any court or judicial authorization to install a tracking device on a vehicle" in a public place. He was aware that that *United States v. Jones*, 132 S. Ct. 945, 951 (2012) was pending before the United States Supreme Court but not decided as of December 21, 2011.

In the early afternoon of December 21, 2011, Agent Heisag attached a GPS tracking device to the Maxima when it was parked in a surface parking lot adjacent to a parking ramp in Phoenix, Arizona. The device used magnets to attach a metallic box to the metal frame of the front bumper. The attachment took less than 30 seconds and did not require the use of tools. No one was inside or around the car. Agent Heisag did not have permission to attach the device, nor did he know who was in possession of the car. The battery-operated GPS device transmitted information periodically; a software system logged the date, time, and GPS coordinates of the Maxima.

---

[2]   Agent Heisag is a police officer in the Scottsdale Police Department in Arizona and has been working as a DEA task force agent for the past nine years. He has been in law enforcement since 1986.

According to Agent Merkling, Barraza did not possess the Maxima until approximately January 15, 2012, one week before the traffic stop leading to his arrest. He was not in possession of the car at the time of the installation and did not claim ownership or possession of the Maxima prior to January 15, 2012. The Maxima was registered to Jesus Arellanes Ojeda ("Ojeda") in Arizona prior to December 30, 2011, when Ojeda transferred the car insurance and registration to an address on Armstrong Avenue in Saint Paul, Minnesota.

### B. Traffic Stop

On January 22, 2012, DEA Agent Merkling[3] notified law enforcement officers in Minnesota including Trooper Schnider[4] and Detective Otterniss[5] that the Maixma would be travelling from Arizona to Minnesota containing a large amount of narcotics in an after-market trap. DEA agents requested Trooper Schnider's assistance with apprehending the car and provided him with updates as to the vehicle's location based on the data from the GPS device.

In the early evening, Trooper Schnider drove to Lakeville, Minnesota, where he spotted a maroon Nissan Maxima matching the DEA's description travelling north on Interstate 35 near County Road 2. (Def.'s Ex. 1 at 00:08-01:52). He immediately noticed two clear violations of Minnesota Law: 1) the car's windows were tinted darkly, restricting over fifty percent of the light and 2) despite the rain, sleet, and snow, the vehicle's headlights were off. After following the Maxima for a short distance, Trooper Schnider activated his lights, and stopped the vehicle on the shoulder just past the nearest exit.

---

[3]   Agent Merkling is a police officer for the City of Oakdale and has been a DEA task force member for over three years.
[4]   Trooper Schnider was a police officer with the City of Oakdale before becoming a Minnesota State Trooper in 2003. He has conducted thousands of vehicle stops.
[5]   Detective Otterniss is a Bloomington Police Department Detective on loan to the DEA. He has over 21 years of experience in law enforcement and has been working with the DEA for six years in an enforcement group that investigates and dismantles large-scale drug shipments.

Approaching the Maxima on the passenger side, Trooper Schnider was unable to see inside the car until the female in the front passenger seat rolled down the window, revealing a male driver. There was only a single key in the car's ignition and fast food wrappers and energy drink cans were strewn throughout the interior, which Trooper Schnider's training and experience, led him to suspect drug trafficking. After explaining the reason for the stop, Trooper Schnider asked the driver to exit the vehicle and walk to the shoulder of the road so they could hear each other.

The driver, later identified as Barraza, explained that he knew his headlights were not working and that neither he nor his girlfriend had a driver's license. Though Spanish appeared to be Barraza's primary language, he responded appropriately to Trooper Schnider's questions in English. Barraza asserted that the Maxima belonged to a man named Jesus and that he and his girlfriend were returning from a weekend trip to Denver, Colorado. Barraza's responses also seemed rehearsed. Barraza and his girlfriend gave conflicting information as to whether they stayed with friends or in a hotel while in Denver.[6] Barraza could not recall the names of the friends he purportedly visited in Denver. Trooper Schnider knew the Denver story was untrue because DEA agents told him that the Maxima began its journey in Arizona. Barraza also told Trooper Schnider that he had lived in Saint Paul for six months but was unable to provide a full address, deepening Trooper Schnider's suspicions. Barraza's facial twitching, pacing, and strange yawning behavior also signaled nervousness.

Barraza provided an identification document that, according to Trooper Schnider, appeared illegitimate but nevertheless identified Barraza by his full name. Because neither Barraza nor his girlfriend had a valid driver's license, and disabled vehicles must be removed

---

[6] While Trooper Schnider spoke with Barraza, his partner, Trooper Kalinoff, spoke with Barraza's girlfriend.

from the shoulder of the road for safety reasons when snow plows are dispatched, Trooper Schnider advised Barraza that the Maxima would be towed. He placed Barraza in his squad car; Trooper Kalinoff brought Barraza's girlfriend to a separate squad car.

### C. Search of Defendant's Vehicle

In Trooper Schnider's squad car, Barraza admitted he never had a Minnesota driver's license and had been arrested previously for driving without a license. Prior to the tow truck's arrival, Trooper Schnider performed a search of the Maxima in accordance with Minnesota State Patrol impound procedure and policy. That initial search revealed suitcases containing a large amount of seemingly unworn clothes—a peculiar fact in as much as Barraza and his girlfriend were ostensibly returning from a weekend trip. The carpet in the trunk showed signs of alteration that led Trooper Schnider to believe was done to access the sheet metal frame of the car. Because of the Maxima's proximity to freeway traffic and the immediacy of its towing, Trooper Schnider did not conduct a full-scale roadside search or memorialize the car's contents.

After the initial inventory search, Barraza consented in writing to a full search of the Maxima. Trooper Schnider gave Barraza a Minnesota State Patrol Consent to Search form written in both English and Spanish. (Def.'s Ex. 2). Barraza appeared to review the document and signed the Spanish portion of the consent form without asking any questions aside from the current date. Barraza did not demonstrate any difficulty reading or understanding the form.[7] (*Id.*).

---

[7] Though Barraza contends that he "clearly had trouble communicating with the trooper," he nonetheless responded appropriately to the questions he was asked. (Def.'s Mem. at 6).

6

After obtaining Barraza's written consent, Trooper Schnider dispatched his K9 partner, Bandit[8], to conduct a sniff search of the vehicle for drugs. Approaching the Maxima from the front driver's side, Bandit changed his body posture, lowered his ears and stared intently at the Maxima, which signaled an alert[9] to a controlled substance. (Def.'s Ex. 1 at 27:20-29:00). Without prompting, Bandit attempted to get underneath the driver's side of the Maxima presumably to get closer to the origin of the odor. Bandit also alerted on the rear driver's side of the car.

Several minutes later, a tow truck arrived, removed the Maxima, and delivered it to a nearby garage. Sixteen kilograms of cocaine were discovered in the spare tire on the underside of the car. Subsequently, Barraza was interviewed in police custody. Barraza's cell phone was searched pursuant to a warrant.

### III. DISCUSSION

Barraza failed to establish he had the requisite standing to challenge the installation of the GPS device. Although Barraza possessed the Maxima when it was being monitored on January 22, 2012, he also lacked standing to challenge the monitoring because he was traveling on a public highway and his location was readily observable. Two readily observable violations of Minnesota law provided a legal basis for Trooper Schnider's traffic stop. Trooper Schnider's observations while conducting the traffic stop gave rise to sufficient reasonable suspicion to

---

[8] Bandit is a Belgian Malinois with over 120 hours of training with Trooper Schnider. He is certified to detect the following narcotics: marijuana, methamphetamine, heroin, cocaine, and silicide mushrooms. Both Bandit and Trooper Schnider were current on their certifications as of the date of the stop.

[9] As Trooper Schnider explained, Bandit alerts to the presence of a controlled substance by changing his body posture and engaging in a pinpoint stare. He indicates the location of the substance by aggressively barking, biting, or scratching. The terms alert and indication are often used interchangeably with the distinction of indicating being when the dog can pinpoint the source of the odor.

conduct an inventory search. Moreover, neither Barraza nor his girlfriend had a valid driver's license, necessitating towing of the vehicle. Before a full-scale search was conducted, Trooper Schnider obtained Barraza's written voluntary consent. The actions of law enforcement were well-within the bounds of the Fourth, Fifth, and Sixth Amendments; Barraza's motions should be denied.

### A. Lawfulness of GPS Device Installation and Monitoring

Barraza objects to the "installation and monitoring" of the GPS tracking device, asserting that officers' conduct was unlawful without a warrant. (Def. Edgar Barraza-Maldonado's Mem. of Law in Supp. of Pretrial Mot. to Suppress Evidence, hereinafter, "Def.'s Mem.") [Doc. No. 28 at 1, 3]. The United State Supreme Court's recent decision in *Jones*, which held that the installation of a GPS device and subsequent monitoring constitutes a search under the Fourth Amendment, is implicated in this case. 132 S. Ct. at 951. *Jones* was issued one day after Barraza's arrest and because this case is pending and not yet final, *Jones* applies. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). Also, the exclusionary rule does not apply if law enforcement relied in good faith on then-binding appellate precedent pursuant to *United States v. Davis,* 131 S. Ct. 2419, 2429 (2011). *See United States v. Ball*, 449 F. App'x 527, 528 (8th Cir. 2011); *United States v. Allison*, No. 10-3141, 2011 WL 6089885, at *1 (8th Cir. Dec. 7, 2011); *see also United States v. Allen*, No. 4:10CR00336, 2012 WL 604211, at *4 (E.D. Ark. Feb. 17, 2012). Significantly, the *Jones* Court did not decide whether the subsequent use of GPS tracking data was lawful based on reasonable suspicion or probable cause. *Jones*, at 132 S. Ct. 954; *See United States v. Amaya*, No. CR 11–4065, 2012 WL 1188456, at *4 (W.D. Iowa Apr. 10, 2012).

### B. Barraza Lacks Standing to Challenge the Installation of the GPS Device.

The defendant bears the burden to establish standing to challenge the lawfulness of a search. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). Barraza is not the actual or registered owner of the Maxima. Nor has Barraza asserted any facts demonstrating that he was in possession of the Maxima on December 21, 2011, when the GPS device was installed. Rather, he came into possession the Maxima one week prior to the stop and did not assert any interest in the car prior to January 15, 2012. The Court agrees with the Government that Barraza lacks the requisite standing to challenge the lawfulness of the attachment of the GPS device. Thus, he has no basis upon which to challenge the GPS device installation.

### C. The Warrantless GPS Monitoring of the Maxima was Lawful.

The Government invokes trespass-based principles upon which the *Jones* holding relied to argue that Barraza similarly lacks standing to challenge the monitoring of his location using the GPS device. *See Jones*, 132 S. Ct. at 949. Citing *United States v. Karo*, 468 U.S. 705, 712 (1984), the Government contends that because the GPS device was attached prior to Barraza's taking possession of the Maxima, the monitoring did not constitute a trespass under *Jones*. Barraza, in contrast, relies on *Jones* in arguing that the warrantless GPS monitoring of his whereabouts was unlawful. 132 S. Ct. at 949.

Barraza's possession of the Maxima at the time of the stop seemingly supports his standing to challenge the GPS monitoring. *Compare United States v. Hanna*, No. 11-cv-20678, 2012 WL 279435 at *4 (S.D.F.L. Jan. 30, 2012) (requiring an "ownership or possessory interest" to assert a challenge under *Jones*) *with United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004) (holding "mere passenger" lacked reasonable expectation of privacy in car in which he was found). But unless a privacy right is societally recognized, mere possession is not enough to

establish a reasonable expectation of privacy. *See California v. Ciraolo,* 476 U.S. 207, 213-14 (1986); *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001). "[A] person travelling in an automobile on a public thoroughfare has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983); *see United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010) ("When electronic monitoring does not invade upon legitimate expectation of privacy, no search occurred." (citing *Knotts*)).

*Knotts* upheld the warrantless use of a beeper device that merely aided law enforcement in tracking the defendant's location on a public highway. 460 U.S. at 285. Relying on a plain view analysis, the Supreme Court reasoned that law enforcement could have tracked defendant through visual surveillance. *Id*. The public nature of defendant's conduct undermined his contention that he had a reasonable expectation of privacy in his publicly observable movements. *Id*. The *Jones* Court did not address whether electronic monitoring in the place of visual observation was unconstitutional and declined to overrule *Knotts*. *Jones*, 132 S. Ct. at 951-54 ("This Court has to date not deviated from the understanding that mere visual observation does not constitute a search." (internal citations omitted)).

No facts were proffered demonstrating Barraza was tracked anywhere other than a public freeway. Barraza has no basis upon which to assert that he had a reasonable expectation of privacy in the location of the Maxima that law enforcement lawfully could have observed without a warrant. *See Knotts*, 460 U.S. at 281; *Marquez*, 605 F.3d at 609. Simply put, Barraza lacks standing to challenge the GPS monitoring.[10]

---

[10]   The Government's container-based theory relying on *United States v. Karo,* 468 U.S. 705, 712 (1985) is intriguing yet distinguishable for two reasons. First, the ether container with the beeper in *Karo* initially belonged to a DEA agent, not a private individual at the time of installation. *Id.* at 708. Second, none of the defendants had actual physical possession of the

Even if Barraza had standing to challenge the monitoring of the Maxima using the GPS device, his motion should be denied because *Davis* applies. *See Allison*, 2011 WL 6089885, at *1 (holding compliance rather than actual reliance on binding appellate precedent is sufficient for *Davis* to apply). Agent Heisag believed that based on the tip, he had probable cause to further investigate the Maxima's involvement in drug trafficking by monitoring a vehicle using a GPS device attached without a warrant in a public place. Agent Heisag's testimony demonstrates good faith subjective reliance on his training on then-binding appellate case law that his conduct was lawful. As such, under *Davis*, the exclusionary rule does not operate. 131 S. Ct. at 2429.

The parties do not dispute that the DEA Agents and the Maxima were in Arizona when the GPS device installation occurred. Barraza's contention that he may have been stopped in states under Eighth Circuit jurisdiction is hypothetical at best. Ninth Circuit precedent rather than Eighth Circuit precedent controls because *Davis* requires an examination of binding precedent at the time and place of the search. 131 S. Ct. at 2428-29. Regardless, neither Eighth nor Ninth Circuit precedent required a warrant to install a GPS device for positional monitoring because such conduct did not constitute a search under the Fourth Amendment. *See United States v. Pineda-Moreno*, 591 F.3d 1212, 1217 (9th Cir. 2010); *United States v. Nwobi*, No. 10-952, 2012 WL 769746, at *3 (C.D. Cal. Mar. 7, 2012); *Marquez*, 605 F.3d at 609-10; *United States v. Okafor*, No. 11-87(8) (MJD/JJK), 2011 WL 4640883, at *2 (D. Minn. Aug. 18. 2011) (citing *Marquez* to find defendant lacked standing to challenge GPS device installation and use). The conduct of the Arizona DEA Agents was, therefore, congruent with binding appellate precedent when the device was installed.

---

ether container with the beeper at the time they were apprehended. *Id*. at 709-10. Here, in contrast, Barraza had actual physical possession of the Maxima at the time of the traffic stop.

Additionally, the *Davis* exception relies on a *Leon*-based good faith analysis employing the policy reasoning that retroactive exclusion in the absence of police misconduct would deter "conscientious police work." *Id.* at 2428-29. Agent Heisag's subjective belief based on Ninth Circuit precedent that he had sufficient probable cause to attach the GPS device without a warrant was reasonable and nonculpable. *See Pineda-Moreno*, 591 F.3d at 1217; *Nwobi*, 2012 WL 769746, at *3. Excluding the fruits of the search would have no deterrent effect and instead would discourage officers from doing their duty. *Id.* at 2429. On these facts, such a result would be inappropriate.

### D. The Traffic Stop Was Lawful.

Independent of the information provided by DEA agents from the tip and GPS device, Trooper Schnider had adequate reasonable suspicion based on his independent observations to conduct the traffic stop. A vehicle stop is considered a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "[S]o long as police have probable cause to believe that a traffic violation has occurred, the stop is valid. . . ." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996). After a vehicle is stopped, an officer is "entitled to conduct an investigation reasonably related in scope to the circumstances that prompted it." *United States v. Collier*, No. 10-3144, 2011 WL 2150223, at *4 (8th Cir. 2011) (citing *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010)). "The officer also has the authority to inquire into the driver's destination, check the driver's license and registration, or to request that the driver step out of the vehicle." *Id.* (citing *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008)). The duration of the stop can be as long as reasonably necessary to issue a citation, conduct a criminal history search, and conduct a routine investigation. *Payne*, 534 F.3d at 951. A traffic stop,

however, can become unlawful if it is longer than necessary. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Trooper Schnider's stop of the Maxima was objectively reasonable because he observed two traffic violations of Minnesota law: driving without headlights in sleet at dusk and excessively tinted windows. *Thomas*, 93 F.3d at 485. Trooper Schnider did not violate Barraza's Fourth Amendment rights when he requested to see his identification and inquired of his home address and destination. *Payne*, 534 F.3d at 951. The approximately 30 minute duration of the stop was reasonable under the Fourth Amendment. (Def.'s Ex. 1 at 01:15-33:33); *Prouse*, 440 U.S. at 653. Trooper Schnider conducted a lawful *Terry* stop.[11] *Id*.

### E. The Inventory Search Was Lawful.

Conducting a roadside inventory search of a car slated for impound comports with well-accepted police department procedures that have been held to be lawful. *See*, *e.g.*, *United States v. Rowland*, 341 F.3d 774, 776 (8th Cir. 2003); *United States v. Edwards*, 563 F. Supp. 2d 977, 988-89 (D. Minn. 2008); *United States v. Waldron*, No. 07-50025, 2007 WL 2080520, at *2 (D.S.D. Jul. 17, 2007). Roadside inventory searches are justified if an officer reasonably suspects that possession of, or driving a vehicle, is unlawful. *Rowland*, 341 F.3d at 776. Ordering all of the occupants of an impounded vehicle to exit the vehicle is permissible constitutionally for officer safety reasons. *Edwards*, 563 F. Supp. 2d at 1000-01. Passengers do not have a reasonable expectation of privacy in a vehicle in which they are a passenger, yet they do have a reasonable expectation of privacy in their person. *See Green*, 275 F.3d at 699.

---

[11] Barraza does not appear to contest the lawfulness of his detention during the *Terry* stop. An indicial of custody analysis is, therefore, unnecessary. *See United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007); *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

Because the car needed to be towed and impounded for lack of a lawful driver, Barraza was required to get out of the car. In order to safely search and remove a vehicle, officers must remove the occupants. *Edwards*, 563 F. Supp. 2d at 1000-01. In this case, such a search was necessary to ensure that the Maxima could be safely towed and to protect against property claims against the state. *Id*. These safety concerns were justified in light of Barraza's odd behavior and Trooper Schnider's observations confirming his suspicion that Barraza was involved in drug trafficking. *Rowland*, 341 F.3d at 776.

Barraza's assertion that Trooper Schnider's search was not an inventory search because he did not complete a written inventory of the vehicle's contents is unpersuasive. Trooper Schnider did not complete inventory paperwork by the road side out of safety concerns and because he knew after it was towed the car would be fully inventoried. Accordingly, Trooper Schnider's conduct comported with established Minnesota State Patrol inventory procedures and did not violate Barraza's Fourth Amendment rights. *Rowland*, 341 F.3d at 776; *Edwards*, 563 F. Supp. 2d at 1000-01.

### F. Barraza's Consent to Search Was Given Voluntarily.

Whether consent to search was voluntary or was the result of duress or coercion is a question of fact to be determined from the totality of the circumstances. *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009); *United States v. Watters*, 572 F.3d 479, 483 (8th Cir. 2009). The Eighth Circuit has identified a number of factors that a court should consider in determining if consent was voluntary in the totality of the circumstances: 1) the individual's age and mental ability; 2) whether the individual was intoxicated or under the influence of drugs; 3) whether the individual was informed of his *Miranda* rights; 4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected

14

criminals; 5) the length of the detention; 6) whether the police used threats, physical intimidation, or punishment to extract consent; 7) whether the police made promises or misrepresentations; 8) whether the individual was in custody or under arrest when consent was given; 9) whether the consent was given in public or in a secluded location; and 10) whether the individual stood by silently or objected to the search. *Arciniega*, 569 F.3d at 398; *United States v. Bradley,* 234 F.3d 363, 366 (8th Cir. 2000). No single factor is dispositive or controlling. *Bradley,* 234 F.3d at 366.

In this case, Barraza signed the consent to search form in a public location after reviewing the form and without asking any questions. He did not revoke his consent—nor does he allege that he did. No evidence exists that Barraza was subject to any physical or verbal coercion. Though Barraza was not read his *Miranda* rights, he was not promised anything in return for his consent. Nor did Barraza show signs of intoxication, incapacity, significant language difficulty when he reviewed and signed the Spanish portion of the consent to search form. (Def.'s Ex. 2). Barraza's consent was, therefore, voluntary based on the totality of the circumstances. *See Arciniega*, 569 F.3d at 398; *Bradley,* 234 F.3d at 366.

**G. Barraza's Consent Extended to the Subsequent Searches of the Car.**

Any challenge Barraza may have to the dog sniff is vitiated by his voluntary consent. Though not required, Trooper Schnider obtained Barraza's written consent to search **prior** to the dispatching of Bandit.[12] The Spanish portion of a Minnesota State Patrol Consent to Search form Barraza signed states in relevant part:

---

[12] One does not have a reasonable expectation of privacy in the odor of illegal drugs in the airspace around a lawfully detained vehicle. *See United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 647 (8th Cir. 1999) (citing *United States v. Morales-Zamora*, 914 F.2d 200 (10th Cir. 1990)). A dog sniff is not a search under the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 708 (1983). Trooper Schnider was not required to establish probable cause or

> I, Edgar D.B.M, hereby grant my consent. . . to search the following vehicle described below including luggage, containers, and contents of all. This includes the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purpose of concealing contraband."

(Def.'s Ex. 2).[13] (*Id.*). The consent to search form provides more than adequate authorization for the use of the detection dog and the subsequent search of the hidden compartment containing cocaine that occurred at the Lakeville garage.

Barraza relies on *United States v. Heir*, 107 F. Supp. 2d 1088, 1096 (D. Neb. 2000) for the proposition that a detection dog alert "is simply too subjective a standard to establish probable cause." He argues that because Bandit alerted rather than indicated the presence of narcotics that the subsequent searches were unlawful.[14] But police did not need probable cause. They had Barraza's voluntary, written consent.

Assuming *arguendo* that Barraza had not signed the consent to search form, police had ample probable cause to fully search the Maxima. Bandit's alert, coupled with Trooper Schnider's observations of the single key in the ignition, alteration of the carpet in the trunk, and inconsistent statements of Barraza and his girlfriend, provided adequate probable cause for a warrantless search of the Maxima under the automobile exception. *See United States v. Bloomfield*, 990 F.2d 412, 416 (8th Cir. 1993) (citing *Chambers v. Maroney*, 399 U.S. 42, 52 (1970)). Barraza's motion to suppress search and seizure should be denied.

---

obtain consent prior to dispatching Bandit. *See United States v. Linkous*, 285 F.3d 716, 719-20 (8th Cir. 2002) ("[A] short detention for a dog sniff after the completion of a traffic stop does not violate the Fourth Amendment.").

[13] This quote comes from the English portion of the Consent to Search form. (Def.'s Ex. 2).

[14] Barraza's reliance on *Heir*, a case involving "ambiguous" behavior from a detection dog of "questionable" abilities is misplaced. *Id.* at 1095 n.1. Not only was Bandit's change in body posture and stare visible on the squad video, but he attempted to access the undercarriage of the Maxima, which was physically impossible. Furthermore, Bandit was a well-trained, award winning detection dog with current certifications. *Heir* is factually distinguishable.

### H. Barraza's Statements Should Not be Suppressed.

At the first pretrial motions hearing, Barraza asserted that he no longer seeks to suppress his in-custody statements. Moreover, the traffic stop and subsequent searches of Barraza's car were lawful. As such, Barraza's motion should be denied as moot.

### I. The Cell Phone Search Warrant was Lawful.

Barraza challenges the lawfulness of the search warrant to search the contents of his cell phone as poisonous fruit of a purportedly illegal search. Because the Court has determined that no basis to suppress search and seizures exists, Barraza's motion should be denied.

### J. Disclosure of the Tipster's Identity is Not Warranted.

The defendant has the burden to demonstrate the need for disclosure of an informant's identity. *See United States v. Crenshaw*, 359 F.3d 977, 1005 (8th Cir. 2004). A court must weigh the defendant's right to the information against the government's privilege to withhold the identity of its confidential informants. *Id*. An informant need only be revealed or made available for interview if to do so would be "relevant and helpful" to the defense or would be "essential to a fair determination of cause." *Rovario*, 353 U.S. at 53. An individual who did not witness or participate in the offense but simply conveys information is a "mere tipster." *Bourbon*, 819 F.2d at 860. If a tipster's involvement was limited to providing information relevant to a probable cause determination, disclosure is not automatically required at the pretrial stage.

At the first pretrial motions hearing, Barraza's counsel stated that the instant motion is relevant to assessing the lawfulness of the GPS device installation. The Government opposes the motion as unnecessary and unwarranted given that the confidential informant was a mere tipster. Barraza lacks the standing to challenge the installation of the GPS device, which was done based

on the tip. Because the Court finds independent grounds to establish probable cause without more information about the tipster, Barraza's *Rovario* fairness and relevance arguments are moot. *Rovario*, 353 U.S. at 53. As such, the tipster need not be identified nor made available to Barraza for an interview beyond the Government's obligations under *Brady* and *Giglio*. *See Rovario*, 353 U.S. at 53; *McCray*, 386 U.S. at 309-310.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion for the Production of Informants for the Purpose of Conducting Pretrial Interviews [Doc. No. 16] be **DENIED**;

2. Defendant's Motion to Suppress Evidence Obtained from Unlawful Searches and Seizures [Doc. No. 18]; be **DENIED**; and

3. Amended Motion to Suppress Statements Made by Defendant [Doc. No. 22] be **DENIED**.

Dated: May 11, 2012

s/ Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **May 25, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.