UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                Case No. 12-CR-0054 (PJS/SER)

                    Plaintiff,

v.                                        MEMORANDUM OPINION
                                              AND ORDER
EDGAR RAFAEL BARRAZA-
MALDONADO,

                    Defendant.

---

Jeffrey S. Paulsen, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Daniel L. Gerdts, ATTORNEY AT LAW, for defendant.

Defendant Edgar Rafael Barraza-Maldonado is charged with one count of possessing

cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Relying on

the Supreme Court's recent decision in *United States v. Jones*, 132 S.Ct. 945 (2012), Barraza

moves to suppress all of the evidence obtained as a result of law enforcement's warrantless

installation of a Global Positioning System ("GPS") device on a 2006 Nissan Maxima

("Maxima") and law enforcement's use of that device to track the Maxima as Barraza drove it

from Arizona to Minnesota. Moreover, Barraza seeks to suppress physical evidence that was

obtained as a result of two searches of the Maxima on January 22, 2012, and statements that

Barraza made to law enforcement following those searches. *See* ECF Nos. 18 and 22. Barraza

further moves for the disclosure of the identity of a government informant for purposes of

conducting a pretrial interview. *See* ECF No. 16.

This matter is before the Court on Barraza's objection to Magistrate Judge Steven E.

Rau's May 11, 2012 Report and Recommendation ("R&R"). Judge Rau concluded that, because

Barraza did not own or possess the Maxima at the time that an agent of the Drug Enforcement

Agency ("DEA") installed the GPS device, and because Barraza did not have a reasonable

expectation of privacy in the location of the Maxima on the public roadways, Barraza lacked

"standing" to challenge the installation and monitoring of the GPS device. *See* R&R at 10 [ECF

No. 35]. Alternatively, Judge Rau found that, even if Barraza had "standing," and even if use of

the GPS device violated Barraza's constitutional rights, any evidence discovered as a result of the

use of the device does not have to be excluded because the DEA agent who installed and

monitored the device relied on then-binding appellate precedent authorizing his actions. *See*

R&R at 11-12 (citing *Davis v. United States*, 131 S.Ct. 2419, 2429 (2011) ("Evidence obtained

during a search conducted in reasonable reliance on binding precedent is not subject to the

exclusionary rule.")).

Moreover, as to the initial search of the Maxima — a roadside search that was conducted

without a warrant a few minutes after the Maxima was pulled over by Minnesota state troopers

— Judge Rau concluded that the search was lawful under the inventory-search exception to the

warrant requirement. *See* R&R at 13-14. And as to the subsequent search of the Maxima — a

warrantless search that was conducted at a nearby garage to which the Maxima had been towed

following the traffic stop — Judge Rau concluded that the search was lawful because Barraza

voluntarily consented to the search. *See* R&R at 14-15. Even if Barraza did not consent to the

search, Judge Rau said, law-enforcement agents nevertheless had probable cause to search the

Maxima because a drug-detection dog had alerted to the presence of illegal drugs in the vehicle

on the roadside before the tow truck arrived. *See* R&R at 16. Finally, Judge Rau concluded that

Barraza failed to meet his burden to demonstrate the need for the government to identify its informant at this time. *See* R&R at 17-18.

The Court has conducted a de novo review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). Based on that review, the Court agrees with Judge Rau's recommended dispositions and much of his analysis. Specifically, the Court agrees that the installation and monitoring of the GPS device did not violate Barraza's rights under the Fourth Amendment and that, even if his rights were violated, the exclusionary rule does not require suppression of the evidence. The Court disagrees, however, with Judge Rau's analysis with respect to the inventory-search and consent exceptions to the warrant requirement. Having carefully reviewed the record, the Court concludes that the government failed to prove that the troopers' initial roadside search complied with standardized police procedures, as would be necessary to invoke the inventory-search exception. The Court is also unable to find that Barraza voluntarily consented to the subsequent search at the garage, given that he signed the consent-to-search form immediately following the troopers' unlawful roadside search. That said, because the physical evidence seized during the troopers' search of the Maxima at the garage resulted from an independent and lawful source — namely, the drug-detection dog's alert, which provided probable cause to justify a warrantless search under the automobile exception — the physical evidence need not be suppressed. Accordingly, the Court adopts the R&R to the extent that it is consistent with this order and writes separately to explain those matters as to which the Court departs from the R&R.

The Court adopts all of the factual findings set forth on pages three through seven of the R&R, save for the following statement: "Prior to the tow truck's arrival, Trooper Schneider

performed a search of the Maxima in accordance with Minnesota State Patrol impound procedure

and policy." R&R at 6. The R&R's factual findings will therefore not be repeated here.

*A. GPS Installation and Monitoring*

1. Lawfulness under the Fourth Amendment

The Fourth Amendment protects the "right of people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

Warrantless searches are "per se unreasonable under the Fourth Amendment — subject only to a

few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338

(2009) (internal quotations omitted). In *United States v. Jones*, 132 S.Ct. 945 (2012), the

Supreme Court unanimously agreed that law enforcement's warrantless installation of a GPS

device on Jones's vehicle — and law enforcement's subsequent use of that device to monitor

Jones's every movement in the vehicle over a four-week period (generating over 2,000 pages of

data) — constituted an unlawful "search" for Fourth Amendment purposes. The Justices divided

five to four, however, on the reasons for their conclusion.

Writing for the majority, Justice Scalia relied on a trespass-based theory, holding that a

"search" occurs for purposes of the Fourth Amendment whenever the government physically

intrudes on "persons, houses, papers, and effects" to obtain information. *See id.* at 949.

Reviving the Supreme Court's historical focus on property rights and common-law trespass,

Justice Scalia explained that the Supreme Court's more recent reasonable-expectation-of-privacy

test — first articulated in Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347

(1967) — "has been *added to*, not *substituted for*, the common-law trespassory test." *Jones*, 132

-4-

S.Ct. at 952 (emphasis in original).[1]  Because Jones was in possession of the vehicle when the government "trespassorily inserted the information-gathering device," *id.* at 952, explained Justice Scalia, Jones's "Fourth Amendment rights do not rise or fall with the *Katz* formulation," *id.* at 950.  Rather, because the government trespassed for the purpose of obtaining information, the government searched — and because the government searched without a warrant, the search was unlawful.  *Id.* at 949.[2]

Concurring in the judgment, Justice Alito (writing for himself and three others) rejected the majority's reliance on "18th-century tort law," *id.* at 957, finding the appropriate question to be whether, under *Katz*, Jones's "reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove," *id.* at 958.  Justice Alito concluded that, while "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable," law enforcement's tracking of Jones's every movement in his vehicle for four weeks violated Jones's reasonable expectation of privacy.  *Id.* at 964 (Alito, J. concurring in judgment) ("We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark.").

---

[1]Under the reasonable-expectation-of-privacy test, a search does not violate the Fourth Amendment rights of a person unless that person has an expectation of privacy in the area searched and that person's expectation is reasonable.  *See Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citing *Katz*, 389 U.S. at 361).

[2]Because the argument was not raised in the lower courts, the Supreme Court declined to consider the government's argument that, even if the installation and use of a GPS device was a search under the Fourth Amendment, the warrantless search was nonetheless reasonable and lawful under an exception to the warrant requirement.  *See Jones*, 132 S.Ct. at 954.

Barraza contends that, when the DEA installed the GPS device on the Maxima, the DEA committed a trespass — and thus, under the trespassory test applied by the *Jones* majority, the actions of the DEA constituted an unlawful "search" for purposes of the Fourth Amendment.[3] Because that is true, Barraza says, it is irrelevant whether installation of the GPS device also violated his reasonable expectation of privacy.

To successfully invoke the *Jones* majority's trespassory test, though, Barraza must be able to maintain an action for trespass, and to be able to maintain an action for trespass, Barraza must have had some type of legally protected property interest in the Maxima at the time that the GPS device was installed.  All nine justices in *Jones* appeared to share this understanding of the trespassory test.

In the majority opinion, Justice Scalia took pains to explain that, even though the vehicle that Jones drove was registered to his wife, Jones was the "exclusive driver" and therefore "had at least the property rights of a bailee" at the time that the GPS device was installed.  *Jones*, 132 S.Ct. at 949 n. 2.  In fact, Justice Scalia specifically relied on Jones's possession of the vehicle at the time that the GPS device was installed to explain why the majority's approach in *Jones* was consistent with two of the Supreme Court's earlier cases involving the installation and monitoring of electronic beepers.

In the first case, *United States v. Knotts*, the Supreme Court held that the warrantless use of an electronic beeper to aide law enforcement in following a target on a public highway did not

---

[3]The government does not contend that the installation and use of the GPS device in this case fell within an exception to the warrant requirement.  Therefore, if the Court concludes that the installation and use of the GPS device constituted a "search," the government's failure to obtain a warrant constitutes a per se violation of Barraza's rights under the Fourth Amendment. *See Gant*, 556 U.S. at 338.

violate the Fourth Amendment under the reasonable-expectation-of-privacy test. 460 U.S. 276, 281 (1983) ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."). Under Justice Scalia's approach, *Knotts* should only have reached the question of whether use of the beeper violated the Fourth Amendment under the reasonable-expectation-of-privacy test if the Court could not find that use of the beeper violated the Fourth Amendment under the trespassory test. According to Justice Scalia, that is exactly what happened: Use of the beeper in *Knotts* could not have been a trespass, Justice Scalia explained, because "[t]he beeper had been placed in the container before it came into Knotts' possession, with the consent of the then-owner." *Jones*, 132 S.Ct. at 952.

In the second case, *United States v. Karo*, the Supreme Court held that the government's *installation* of an electronic beeper in a container with the consent of the original owner *before* the container came into Karo's possession did not violate the Fourth Amendment, but the government's *use* of the beeper to monitor the container *after* it came into Karo's possession did violate the Fourth Amendment under the reasonable-expectation-of-privacy test. 468 U.S. 705, 712, 715 (1984). Again, as Justice Scalia would have it, *Karo* should only have reached the question of whether use of the beeper violated the Fourth Amendment under the reasonable-expectation-of-privacy test if the Court could not find that use of the beeper violated the Fourth Amendment under the trespassory test. And again, according to Justice Scalia, that is exactly what happened: "Karo accepted the container as it came to him, beeper and all, and was therefore not entitled to object to the beeper's presence, even though it was used to monitor the container's location. . . . Jones, who possessed the Jeep at the time the Government trespassorily inserted the information-gathering device, is on much different footing." *Jones*, 132 S.Ct. at 952.

It appears, then, that the *Jones* majority concluded as follows:  When the government installs a GPS device (or similar device) on a piece of property before the defendant has any legal interest in the property, the installation of the device is not a trespass on the property of the defendant and therefore is not a search of the defendant for purposes of the trespassory test.  (It may, of course, be a trespass on the property — and therefore a search — of someone else.) Moreover, when a defendant takes possession of a piece of property on which a GPS device has already been installed, the continued monitoring of that device is also not a trespass on the property of the defendant, and therefore is not a search of the defendant for purposes of the trespassory test.  But the continued monitoring of the device may (or may not) be a search of the defendant under the reasonable-expectation-of-privacy test.  That would depend on the facts of the case.  *Compare Knotts*, 460 U.S. at 283 (no reasonable expectation of privacy in location on public streets) *with Karo*, 468 U.S. at 714-15 (reasonable expectation of privacy in location in a private residence).

This understanding of the *Jones* majority is shared by Justice Alito and the other concurring justices.  In criticizing the approach of the majority, Justice Alito wrote:  "[T]he Fourth Amendment applies, the Court concludes, because the officers installed the GPS device after respondent's wife, to whom the car was registered, turned it over to respondent for his exclusive use.  But if the GPS had been attached prior to that time, the Court's theory would lead to a different result."  *Jones*, 132 S.Ct. at 961 (Alito, J. concurring in judgment).

Here, it is undisputed that Barraza did not own, possess, or have any type of property right in the Maxima when the DEA agent installed the GPS device.  *See* ECF No. 43 at 7.  The Court acknowledges that, unlike the government agents in *Knotts* and *Karo*, the DEA agent in

this case installed the GPS device on the Maxima without the owner's permission and thus committed a trespass. *See id.* at 19. But the DEA agent did not trespass on any property of *Barraza*. The DEA agent installed the GPS device on December 21; Barraza had nothing to do with the Maxima until about January 15, 2012, when he first took possession of the vehicle. *Id.* at 7. Like the defendant in *Karo*, Barraza "accepted the [vehicle] as it came to him, [GPS device] and all, and [is] therefore not entitled to object to the [GPS device's presence], even though it was used to monitor the [vehicle's] location." *Jones*, 132 S.Ct. at 952.

Moreover, even if the DEA had installed the GPS device on the Maxima *after* Barraza took possession of it, Barraza could still not establish that the installation of the device constituted a "search" under the trespassory test because there is no evidence that Barraza was the exclusive driver of the Maxima or that he exercised exclusive control over the vehicle. To the contrary, all of the evidence in the record indicates that Barraza's possession of the vehicle was temporary and non-exclusive. Barraza was given possession of the vehicle around January 15 and was instructed to leave the vehicle at a gas station. *See* ECF No. 43 at 7-8. Several days later, he was told to pick up the vehicle and drive it to Minnesota. *See id.* At most, then, Barraza had temporary, non-exclusive possession of the vehicle. Such possession would not have given Barraza a sufficient property interest to maintain an action for trespass, and therefore, even if the government had installed the GPS device on the Maxima while Barraza possessed it, such an installation would not have been a "search" under the trespassory test. Accordingly, the Court holds that the installation and monitoring of the GPS device by DEA agents was not a "search" for purposes of the Fourth Amendment under the trespassory test applied by the *Jones* majority.

That is not the end of the matter, however.  As *Jones* acknowledged, the more recent reasonable-expectation-of-privacy test "add[s] to" the traditional trespassory test.  *Jones*, 132 S.Ct. at 952 (emphasis omitted).  Thus, it is possible that, even though the government did not trespass on any of Barraza's property, the government nevertheless violated Barraza's Fourth Amendment rights by intruding in an area in which he had a reasonable expectation of privacy.[4] After reviewing the record, however, the Court agrees with Judge Rau that Barraza did not have a reasonable expectation of privacy in the Maxima's location on public streets between Arizona and Minnesota.

As noted above, the Supreme Court has long held that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  *Knotts*, 460 U.S. at 281.  Thus, in *Knotts*, the Supreme Court held that the warrantless use of an electronic beeper to aide law enforcement in monitoring the location of a container on a public highway does not violate the Fourth Amendment.  *Id.* at 285. In *Jones*, Justice Alito distinguished *Knotts* on the grounds that Jones was subject to far more intrusive monitoring than Knotts — specifically, a GPS device was used to track Jones's every movement in his vehicle 24 hours a day for four weeks.  *See Jones*, 132 S.Ct. at 964; *see also United States v. Maynard*, 615 F.3d 544, 558 (D.C. Cir. 2010) ("Here the police used the GPS device not to track Jones's 'movements from one place to another,' *Knotts*, 460 U.S. at 281, 103 S.Ct. 1081, but rather to track Jones's movements 24 hours a day for 28 days as he moved among

---

[4]Justice Scalia emphasized that police conduct could constitute an unlawful search under *Katz*'s reasonable-expectation-of-privacy test even if the same conduct did not constitute an unlawful search under the trespassory test.  *Jones*, 132 S.Ct. at 953 ("[U]nlike the concurrence, which would make *Katz* the *exclusive* test, we do not make trespass the exclusive test." (emphasis in original)).

scores of places, thereby discovering the totality and pattern of his movements from place to place to place."), *aff'd sub nom. United States v. Jones*, 132 S.Ct. 945 (2012).

The monitoring of Barraza much more closely resembled the monitoring that the Supreme Court found permissible in *Knotts* than the monitoring that the Supreme Court found impermissible in *Jones*. In contrast to *Jones*, here there is no evidence that the DEA agents did anything other than track the vehicle that Barraza was driving "from one place to another" — that is, from Arizona to Minnesota. Because Barraza "voluntarily conveyed [his progress and route] to anyone who wanted to look" by driving on public roads, he could not reasonably have expected privacy in the location of the Maxima. *See Knotts*, 460 U.S. at 281.

In sum, the installation and monitoring of the GPS device on the Maxima did not violate Barraza's rights under the Fourth Amendment. The actions of the DEA agents did not constitute a trespass because Barraza had no legally cognizable property interest in the Maxima at the time that the GPS device was installed — or, for that matter, at any time after the GPS device was installed. And the actions of the DEA agents did not violate Barraza's reasonable expectation of privacy. Under either of the two tests applied in *Jones*, then, the actions of the DEA agents were constitutional.

### 2.  Good-Faith Exception

Even if the Court is incorrect and the installation or monitoring of the GPS device did violate the Fourth Amendment, the Court agrees with Judge Rau that the exclusionary rule does not apply because the DEA agents acted in reliance on then-binding appellate precedent. *See* R&R at 11-12 (citing *Davis*, 131 S.Ct. at 2429 ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.")). Judge Rau

concluded that, under then-binding Eighth and Ninth Circuit precedents, the installation and

monitoring of a GPS device without a warrant did not violate the Fourth Amendment.[5]  *See* R&R

at 11; *see also United States v. Pineda-Moreno*, 591 F.3d 1212, 1217 (9th Cir. 2010) ("We

conclude that the police did not conduct an impermissible search of Pineda-Moreno's car by

monitoring its location with mobile tracking devices."), *vacated*, 132 S.Ct. 1533 (2012); *United

States v. Marquez*, 605 F.3d 604, 610 (8th Cir. 2010) ("[W]hen police have reasonable suspicion

that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is

parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable

period of time.").  Because the DEA agents complied with the then-binding precedents of the

Eighth and Ninth Circuits, concluded Judge Rau, the exclusionary rule does not apply.[6]

_____

[5]Before Judge Rau, the government argued that Ninth Circuit precedent controlled
because the DEA agent installed the GPS device in Arizona.  *See* ECF No. 29 at 6.  Barraza
seemed to agree that Ninth Circuit precedent controlled the decision to *install* the GPS device.
But, Barraza argued, because the GPS device was *monitored* while the Maxima was in
Minnesota, and because that *monitoring* constituted a search under the Fourth Amendment, the
legality of that monitoring was governed by Eighth Circuit precedent.  *See* ECF No. 28 at 3.  As
noted, Judge Rau found that both the installation and monitoring of the GPS were lawful under
the then-applicable precedents of both the Eighth and Ninth Circuits, so the parties' dispute is
academic.

[6]The Court notes that, although DEA Agent Heisig testified that he was aware of relevant
Ninth Circuit precedent when he installed the GPS device in Arizona, *see* ECF No. 43 at 16,
there is no evidence in the record that any of the officers involved in this case were aware of
relevant Eighth Circuit precedent.  *Davis* does not, however, require an officer to have had actual
knowledge of specific appellate precedent, so long as his or her conduct strictly complies with
that precedent.  *See United States v. Amaya*, No. CR 11-4065, 2012 WL 1188456, at *7 (N.D.
Iowa Apr. 10, 2012) ("Lower courts, accordingly, when applying *Davis*, have looked to officers'
compliance with, not knowledge of, binding appellate precedent."), *modified and withdrawn in
part*, 2012 WL 1523045 (N.D. Iowa May 1, 2012); *see also United States v. Allison*, 454 Fed.
App'x 521, 522-23 (8th Cir. 2011) (evaluating compliance with binding precedent without
referring to the officer's subjective knowledge); *United States v. Osborne*, 673 F.3d 508, 514-15
(6th Cir. 2012) (same).

In his objection to the R&R, Barraza does not dispute that all of the law-enforcement officers in this case acted in strict compliance with the law as set forth in *Pineda-Moreno* (Ninth Circuit) and *Marquez* (Eighth Circuit). Instead, Barraza contends that Judge Rau's reliance on *Davis* is misplaced for two reasons: (1) *Davis* does not apply because the constitutionality of the use of GPS devices was unsettled at the time; and (2) the officers in this case could not have relied on binding precedent in good faith because Minnesota *state* law has long required a warrant for the use of mobile-tracking devices. *See* ECF No. 40 at 4-6.

As to his first argument: Barraza points to Justice Sotomayor's concurring opinion in which she noted that *Davis* does not apply in situations where "'the constitutionality of a particular search is unsettled.'" *See* ECF No. 40 at 4 (quoting *Davis*, 131 S.Ct. at 2435 (Sotomayor, J. concurring in judgment)). According to Barraza, the D.C. Circuit had "required a warrant for the use of the GPS device" since August 2010, over a year before the DEA agents used a GPS device in this case.[7] *See* ECF No. 40 at 5. Because the warrantless installation and monitoring of GPS devices "was not the subject of *universal* judicial or legislative agreement at the time the agents carried out the search," says Barraza, *Davis* does not apply. *Id.* at 4-5 (emphasis added).

Barraza misunderstands *Davis*. When Justice Sotomayor referred to the constitutionality of a search being "unsettled," she was referring to the constitutionality of a search being unsettled

---

[7]Contrary to Barraza's assertion, the D.C. Circuit did not hold that GPS monitoring required the use of a warrant. *See United States v. Jones*, 625 F.3d 766, 767 (D.C. Cir. 2010) ("[B]ecause the Government did not argue the points, the court did not decide whether, absent a warrant, either reasonable suspicion or probable cause would have been sufficient to render the use of the GPS lawful.") (Ginsburg, Tatel, and Griffith, JJ. concurring in denial of rehearing en banc).

*in the relevant jurisdiction*, not *universally*.  Thus, if it is clear under Second Circuit precedent

that a particular type of search is lawful, clear under Fourth Circuit precedent that the same

search is not lawful, and not clear under Sixth Circuit precedent whether or not the search is

lawful, then *Davis* protects searches within the Second Circuit but not searches within the Fourth

and Sixth Circuits.[8]  As Justice Alito's majority opinion made clear:

> [W]hen binding appellate precedent specifically *authorizes* a
> particular police practice, well-trained officers will and should use
> that tool to fulfill their crime-detection and public-safety
> responsibilities.  An officer who conducts a search in reliance on
> binding appellate precedent does no more than act as a reasonable
> officer would and should act under the circumstances.  The
> deterrent effect of exclusion in such a case can only be to
> discourage the officer from doing his duty.

*Davis*, 131 S.Ct. at 2429 (emphasis in original) (numerous internal quotations and citations

omitted).  Here, then-binding appellate precedents (*Pineda-Moreno* and *Marquez*) authorized

DEA agents to install a GPS device on the Maxima and to use that device to monitor the

vehicle's movements.  That law-enforcement officers in the District of Columbia may not have

been able to do the same thing did not render the constitutionality of the use of GPS devices

unsettled in the Eighth or Ninth Circuits.  Both circuits had explicitly addressed the

---

[8]Although ultimately irrelevant to whether *Davis* applies, it is worth noting that, notwithstanding the D.C. Circuit's decision in *United States v. Maynard*, every other federal court of appeals to have addressed the issue had concluded that the installation and monitoring of a GPS device on a vehicle is not a search under the Fourth Amendment.  *See United States v. Jones*, 625 F.3d 766, 767 (D.C. Cir. 2010) ("[T]he panel's decision is inconsistent not only with every other federal circuit which has considered the case, but more importantly, with controlling Supreme Court precedent set forth in *United States v. Knotts*, 460 U.S. 276 (1983).") (Sentelle, C.J., joined by Henderson, Brown, and Kavanaugh, JJ. dissenting in denial of rehearing en banc).

constitutionality of the use of GPS devices, and both circuits had explicitly held that the use of

GPS devices was constitutional.

      As to his second argument:  Barraza contends that *Davis* does not apply because

Minnesota state law has long required a warrant for the use of mobile tracking devices.  *See* ECF

No. 40 at 6 ("The established law of the state of Minnesota had required for more than twenty

years that the use of a mobile tracking device be first approved by court order.").  But the

lawfulness of the use of GPS devices under *state* law is irrelevant; Barraza is being prosecuted in

*federal* court.  "When evidence . . . is offered in a federal prosecution, the legality of the search

and seizure is not determined by reference to a state statute, but rather is resolved by Fourth

Amendment analysis."  *See United States v. Howard*, 532 F.3d 755, 760 (8th Cir. 2008) (internal

quotations omitted); *see also United States v. Appelquist*, 145 F.3d 976, 978 (8th Cir. 1998)

("[F]ederal courts do not suppress evidence seized by state officers in conformity with the Fourth

Amendment because of state law violations.").

      In sum, the Court joins every district court to have addressed the question in concluding

that, when law-enforcement officers installed and monitored a GPS device as authorized by then-

binding circuit-court precedent, the "harsh sanction of exclusion," *Davis*, 131 S.Ct. at 2429, is

unwarranted.  *See, e.g.*, *Amaya*, 2012 WL 1188456, at *7-8; *United States v. Nwobi*, No. CR 10-

952(C), 2012 WL 769746, at *2-4 (C.D. Cal. Mar. 7, 2012); *United States v. Heath*, No. CR 12-

4-H, 2012 WL 1574123, at *1 (D. Mont. May 3, 2012); *United States v. Aquilar,* No. 4:11-CR-

298, 2012 WL 1600276, at *2 (D. Idaho May 7, 2012); *United States v. Rosas-Illescas*, No. 2:11-

CR-492, 2012 WL 1946580, at * 5 (N.D. Ala. May 30, 2012).

### B.  Search of the Maxima on January 22

Barraza challenges the legality of the two physical searches of the Maxima on January 22, 2012 — that is, the troopers' initial roadside search of the Maxima and then the subsequent search of the vehicle after it was towed to a nearby garage.  Barraza does not, however, challenge the troopers' impoundment of the vehicle, as it is undisputed that neither Barraza nor his girlfriend (the only passenger in the car) had a driver's license.[9]  Instead, Barraza argues that the roadside search was not an "inventory" search; that he did not voluntarily consent to the subsequent search of the vehicle at the garage; and that the alert of the drug-detection dog (named "Bandit") did not give the troopers probable cause to search the vehicle at the garage.

### 1.  Initial Roadside Search

The Court agrees with Barraza that the government failed to meet its burden to establish that the troopers' initial roadside search was in fact an inventory search.

"The inventory search exception to the Fourth Amendment's warrant requirement permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause."  *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011).  "An inventory search is reasonable and constitutional if it is conducted according to

---

[9]The Court also does not understand Barraza to be challenging the legality of the traffic stop itself.  Barraza does not dispute that he committed two traffic violations when he was pulled over — specifically, (1) the Maxima's windows were too darkly tinted in violation of Minn. Stat. § 169.71; and (2) even though it was sleeting, the Maxima's headlights were not turned on, as required by Minn. Stat. § 169.48.  *See United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009) ("Any traffic violation, however minor, provides probable cause for a traffic stop." (citation and quotations omitted)).  It is irrelevant that the troopers may have had an investigatory motive for the stop.  *See United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) ("[I]t is irrelevant that the officer would have ignored the violation but for his ulterior motive."), *cert. denied*, 132 S.Ct. 278 (2011).

standardized police procedures." *Id.* It is the government's burden to establish that the inventory-search exception applies. *See United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011).

Trooper Schneider testified that, after he called a tow truck, he and Trooper Kalinoff conducted a search to "document the belongings in the vehicle." ECF No. 42 at 23. During that search, Trooper Schneider looked through the passenger compartment and through the luggage that he found in the trunk. *Id.* Trooper Schneider admitted on cross-examination that he did not fill out an inventory form or take any notes regarding the contents of the vehicle, *see id.* at 35-36, despite the fact that the purported justification for the search was to "document" the contents of the car. Trooper Schneider suggested that he never completed an inventory form because the troopers later discovered 16 kilograms of cocaine in the Maxima when the vehicle was searched at a nearby garage. *See id.* at 35.

Because the government failed to introduce evidence about the Minnesota State Patrol's inventory-search procedures, the Court has no way of knowing whether Troopers Schneider and Kalinoff's initial roadside search complied with standardized procedures. There is no evidence in the record, for example, that the troopers' search of closed containers (such as luggage) was consistent with standardized procedures. There is also no evidence in the record that, according to standardized procedures, troopers need not prepare a written inventory of the vehicle's contents if illegal contraband is later found. (The Court very much doubts that such a rule exists, as that would defeat one of the principal purposes of an inventory search: "the protection of the police against claims or disputes over lost or stolen property." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).)

The Court acknowledges that the mere failure to adhere to standardized procedures is not alone dispositive.  "Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search."  *Taylor*, 636 F.3d at 465.  In other words, "[s]omething else must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle."  *Id.* (internal quotations omitted).  Here, in light of the troopers' suspicions that there were drugs in the Maxima before they searched the vehicle — and in light of Trooper Schneider's failure to document *any* of the vehicle's contents — there is strong reason to believe that the roadside "inventory" search was a pretext for an investigatory search for drugs.

Having concluded that the initial roadside search was unlawful, the Court turns now to the question of what evidence, if any, must be suppressed as "a fruit of the poisonous tree."  *Nardone v. United States*, 308 U.S. 338, 341 (1939).

## 2.  Independent Source

The fruit-of-the-poisonous-tree doctrine provides that evidence that is obtained "directly or indirectly through the exploitation of police illegality" is inadmissible.  *United States v. Simpson*, 439 F.3d 490, 493 (8th Cir. 2006).  But when police obtain evidence by "means wholly independent of any constitutional violation" — that is, when the evidence is discovered through an independent and lawful source — such evidence is admissible.  *Nix v. Williams*, 467 U.S. 431, 443 (1984).  As the Supreme Court explained:

> "The interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.  When the challenged evidence has an

-18-

> independent source, exclusion of such evidence would put the
> police in a worse position than they would have been in absent any
> error or violation."

*Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nix*, 467 U.S. at 443) (emphasis in

original)).

This much is undisputed:  Based on information provided by the DEA and based on their

independent observations, Troopers Schneider and Kalinoff suspected that there were drugs in

the Maxima *before* they conducted any search of the vehicle.  *See* ECF No. 42 at 10, 13, 21-22.

The troopers did not find any illegal contraband when they conducted the initial roadside search,

although Trooper Schneider noticed that the carpet lining the trunk showed signs of alteration.

*See id.* at 24.  Within minutes of completing the initial roadside search, Trooper Schneider

deployed Bandit — who had been riding with Trooper Schneider and therefore was on the scene

— to sniff the exterior of the vehicle.  *See id.* at 26-29; *see also* Def. Ex. 1 at 23:30-27:00.

During Bandit's sniff of the Maxima (which took less than two minutes), the dog changed his

body posture and attempted to crawl underneath the Maxima.  *See* ECF No. 42 at 28; Def. Ex. 1

at 27:20-28:55.  According to Trooper Schneider, Bandit's change in behavior signaled an "alert"

to the presence of illegal drugs somewhere in the Maxima, although Bandit could not pinpoint

the exact location of the drugs.  *See* ECF No. 42 at 29.  After the Maxima was towed to a nearby

garage, the troopers discovered 16 kilograms of cocaine in the spare tire underneath the vehicle.

*See id.*

Assuming for the moment that Bandit's alert provided the troopers with probable cause to conduct a warrantless search of the Maxima under the automobile exception[10] — Barraza's objection to this assumption is addressed below — the question of whether Bandit's alert constituted an independent source for the discovery of the drugs turns on whether Trooper Schneider would have deployed Bandit to sniff the Maxima if he and Trooper Kalinoff had not conducted the unlawful roadside search of the vehicle.  In other words, if Trooper Schneider deployed Bandit because of what he and Trooper Kalinoff saw during their unlawful search, then Bandit's alert would not be an independent source for the subsequent discovery of the cocaine and other physical evidence.[11]

Having reviewed the record, the Court concludes that the unlawful search did not cause Trooper Schneider to deploy Bandit to sniff the exterior of the Maxima.  *Before* the vehicle was unlawfully searched, the following occurred:

---

[10]In the R&R, Judge Rau found that, after the troopers had completed their initial roadside search, Barraza voluntarily consented to the further search of Maxima in the garage when he signed a consent-to-search form.  *See* R&R at 14-15.  Given that Barraza's consent occurred immediately following the unlawful search of the Maxima without any intervening circumstances, the Court is reluctant to find that Barraza's consent was voluntary.  *See United States v. Barnum*, 564 F.3d 964, 972 (8th Cir. 2009) (explaining that the closer "the temporal proximity between the Fourth Amendment violation and the grant of consent . . . the more likely the defendant's consent was influenced by, or the product of, the police misconduct" and that "an intervening circumstance between the Fourth Amendment violation and the defendant's consent indicates that the consent was made of the defendant's free will" (internal quotations and citations omitted)).  The Court therefore does not rely on the consent exception to the warrant requirement to justify the troopers' subsequent search of the Maxima at the garage.

[11]Barraza wisely does not argue that Bandit's sniff of the Maxima was an illegal search. It was plainly lawful.  *See United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007) ("A dog sniff of the exterior of a vehicle does not constitute a search." (citing *Illinois v. Caballes*, 543 U.S. 405, 408 (2005))).

- Troopers Schneider and Kalinoff were asked by DEA agents to intercept the Maxima and told that the DEA believed that the Maxima was transporting a large quantity of drugs in a hidden compartment. *See* ECF No. 42 at 10.

- Pursuant to the DEA's request, and in obvious anticipation of deploying a drug-detection dog to sniff the Maxima, Trooper Schneider had Bandit with him in his squad car. *See id.* at 26.

- Immediately after the traffic stop of the Maxima, Trooper Schneider noticed that there was only a single key in the ignition, which (based on his training and experience) led him to suspect drug trafficking. *See id.* at 13.

- Trooper Schneider's initial suspicions were deepened by his observation of Barraza's nervousness; by Barraza's untruthful assertion that he and his girlfriend were coming from Denver; and by inconsistencies between Barraza's and his girlfriend's accounts of their trip. *See id.* at 15-16, 21-22.

Under these circumstances, it is clear that Trooper Schneider would have deployed Bandit to sniff the Maxima, even if Trooper Schneider had not conducted the unlawful roadside search. The Court acknowledges that Trooper Schneider's suspicions of drug trafficking were undoubtedly deepened by his observation of the altered carpet in the trunk during the unlawful search. *See id.* at 24. But given all of the information that Trooper Schneider had before he conducted the search — and given that Bandit was already on the scene, and that deploying Bandit was quick, easy, and indisputably lawful — there is simply no reason why Trooper Schneider would *not* have deployed Bandit to sniff the Maxima. In short, it defies common

sense to believe that Trooper Schneider deployed Bandit to sniff the Maxima only because

Trooper Schneider observed altered carpet in the trunk during the unlawful search.

Under a different set of facts — if, for example, Trooper Schneider had called someone to

bring Bandit to the scene only after observing the altered carpet during the unlawful search — the

independent-source doctrine might not apply.  Here, though, the information known to Trooper

Schneider before he searched the Maxima made the deployment of Bandit inevitable.  Because

Bandit's alert was a lawful and independent source for the discovery of the cocaine and other

evidence in the vehicle, suppression of that evidence would put the government in a worse

position than it would have been in if no constitutional violation had occurred.  *See Nix*, 467 U.S.

at 443.  Suppression of the physical evidence is, therefore, not warranted.[12]

### 3.  Bandit's Alert and Probable Cause

Barraza challenges Judge Rau's conclusion that "Bandit's alert, coupled with Trooper

Schneider's observations . . . provided adequate probable cause for a warrantless search of the

Maxima under the automobile exception."  R&R at 16.  Barraza does not dispute that an

"indication" by a properly trained and reliable drug-detection dog provides probable cause to

justify a warrantless search of a vehicle.  *See United States v. Winters*, 600 F.3d 963, 967 (8th

Cir. 2010), *cert. denied*, 131 S.Ct. 255 (2010).  Nor does Barraza contend that Bandit was

---

[12]The Court recognizes that, because the government did not anticipate that this Court would disagree with Judge Rau's findings regarding the legality of the roadside search and the validity of Barraza's consent to the garage search, the government did not make any arguments about the independent-source doctrine — and therefore Barraza did not have the opportunity to respond to any such arguments.  Although the Court believes that the independent-source doctrine clearly applies under the circumstances of this case, the Court invites Barraza to move for reconsideration of the Court's ruling (and, if necessary, to reopen the record) if Barraza believes that the Court has erred in some respect.

improperly trained or otherwise unreliable.  Instead, Barraza argues that Bandit did not actually

"indicate" — that is, pinpoint the precise location of drugs.  Instead, Barraza says, Bandit merely

"alerted" — that is, merely showed an interest in further exploring the Maxima — and Trooper

Schneider subjectively interpreted Bandit's alert as evidence that Bandit had detected drugs in

the vehicle.[13]  Relying on *United States v. Heir*, 107 F. Supp. 2d 1088 (D. Neb. 2000), Barraza

contends that an officer's subjective interpretation of a dog's alert does not amount to probable

cause.

       Barraza's reliance on *Heir* is misplaced for a number of reasons.  First, *Heir* is a district

court opinion from Nebraska and thus is obviously not binding on this Court.  Second, *Heir* is

factually distinguishable.  There, the magistrate judge emphasized that the dog's behavior was

"ambiguous."  *Id.* at 1096.  Here, video footage of Bandit's sniff of the Maxima, *see* Def. Ex. 1 at

27:30-28:20, confirms Trooper Schneider's testimony that Bandit repeatedly tried to get

underneath the Maxima.  Trooper Schneider testified that, based on his training and experience,

Bandit had detected illegal drugs and was "trying to get to the source of the odor."  ECF No. 42

at 28.  And third, to the extent that *Heir* held that probable cause exists only when a drug-

detection dog "indicates" by pinpointing the precise location of drugs within a vehicle, *Heir* is

inconsistent with Eighth Circuit precedent, which has long held that, while such an indication is

---

[13]At the hearing, Trooper Schneider testified about the difference between an "alert" and an "indication."  According to Trooper Schneider, an "alert" is when the dog initially changes its behavior when it smells the odor that it is trained to detect.  ECF No. 42 at 27.  An "indication," in contrast, is when the dog "actually comes into the source of the odor and can pinpoint that location."  *Id.* at 28.

*sufficient* to establish probable cause, it is not *necessary*.[14]  *See United States v. Carbajal*, 449 Fed. App'x 551, 554 (8th Cir. 2012) ("Regardless of whether [the dog's] actions were *sufficient* to establish probable cause standing alone, we consider the totality of the circumstances, including Trooper Pinner's observations, and conclude that Trooper Pinner had probable cause to believe he would find contraband in Carbajal's vehicle." (emphasis added)); s*ee also Olivera-Mendez*, 484 F.3d at 512 ("[A] dog's positive indication *alone is enough* to establish probable cause for the presence of a controlled substance if the dog is reliable." (emphasis added and internal quotations omitted)); *Winters*, 600 F.3d at 968 ("Even if a drug dog's performance record raises questions about his reliability . . . the issue is whether the totality of the circumstances present at the scene provided probable to search [the vehicle].").

Having reviewed the record, the Court agrees with Judge Rau that Bandit's alert — together with the information that Trooper Schneider had received from the DEA, Trooper Schneider's observation of Barraza's nervousness, Barraza's untruthful assertion that he and his girlfriend were coming from Denver, and the inconsistencies between Barraza's and his girlfriend's accounts of their trip — provided probable cause for the troopers to believe that they would find drugs in the Maxima.  *See United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005) ("Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a

---

[14]As the government points out, *Heir*'s standard for probable cause has been expressly rejected by at least one court of appeals.  *See United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) ("[T]he general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause.  We decline to adopt the stricter rule urged by Mr. Parada, which would require the dog to give a final indication before probable cause is established."), *cert. denied*, 130 S.Ct. 3321 (2010).

particular place."). Accordingly, the troopers' subsequent warrantless search of the Maxima was

lawful under the automobile exception. *See United States v. Mayo*, 627 F.3d 709, 713 (8th Cir.

2010) ("As long as the law enforcement officials have probable cause, they may search an

automobile without a warrant under the automobile exception." (internal quotations omitted)).

### D. Other Ancillary Matters

Barraza's motion to suppress statements that he made after the troopers had discovered

the cocaine appears to be based on the allegedly unlawful stop of the Maxima. Given the Court's

rulings that the use of the GPS device was lawful and that Troopers Schneider and Kalinoff

lawfully stopped the Maxima based on two traffic violations, the Court sees no basis to suppress

Barraza's statements.[15]

Barraza also moves to suppress evidence of what the government found on his cell phone,

which the government seized in late February or early March pursuant to a search warrant.

Barraza contends that all of the information that provided probable cause to support the search

was the fruit of a poisonous tree. But given the Court's rulings, the only tainted evidence in this

case is Trooper Schneider's observations regarding the carpet in the trunk of the Maxima. There

is ample untainted evidence — including, for example, the DEA's monitoring of the GPS device,

Bandit's alert to the presence of illegal drugs in the Maxima, and the discovery of 16 kilograms

---

[15]The Court does not understand Barraza to be arguing that his statements should be
suppressed because of the troopers' searches of the Maxima. There is no evidence in the record
to suggest that any of Barraza's statements were made as a result of the troopers' searches. *See
United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007) ("[T]he defendant bears the initial
burden of establishing the factual nexus between the constitutional violation and the challenged
evidence."); *see also Olivera-Mendez*, 484 F.3d at 511 ("Evidence should not be excluded from
trial based on a constitutional violation unless the illegality is at least a but-for cause of obtaining
the evidence.").

of cocaine in the spare tire underneath the Maxima — to provide probable cause for the search of Barraza's cell phone.  Barraza's motion to suppress evidence found on his cell phone is therefore denied.[16]

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.    Defendant Edgar Rafael Barraza-Maldonado's objection [ECF No. 40] is OVERRULED IN PART and SUSTAINED IN PART.

2.    The Court ADOPTS the R&R [ECF No. 35] to the extent that it is consistent with this order.

3.    Barraza's motion for disclosure of the government's informant [ECF No. 16] is DENIED.

4.    Barraza's motion to suppress evidence [ECF No. 18] is GRANTED IN PART. The motion is GRANTED insofar as it applies to evidence of what Troopers Schneider and Kalinoff observed during their initial roadside search of the Maxima.  The motion is DENIED in all other respects.

5.    Barraza's amended motion to suppress statements [ECF No. 22] is DENIED.

Dated: July 19, 2012                                s/Patrick J. Schiltz
                                                            Patrick J. Schiltz
                                                            United States District Judge

_____

[16]Barraza does not object to Judge Rau's recommendation that his motion for the disclosure of the government's informant be denied.

-26-